**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| ALLEN HORTON II, | Case No. 3:21-CV-00280-CLB |
| Plaintiff, | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**[1] |
| v. | [ECF No. 50] |
| WILLIAM GITTERE, *et al.*, | |
| Defendants. | |

This case involves a civil rights action filed by Plaintiff Allen Horton ("Horton") against Defendant Ted Hanf, M.D. ("Dr. Hanf"). Currently pending before the Court is Dr. Hanf's motion for summary judgment. (ECF Nos. 50, 52, 56.)[2] Horton responded, (ECF Nos. 67, 66)[3], and Dr. Hanf replied. (ECF No. 68.) For the reasons stated below, Dr. Hanf's motion for summary judgment, (ECF No. 50), is granted.

I.      **BACKGROUND**

A.      **Procedural History**

Horton is an inmate in the custody of the Nevada Department of Corrections ("NDOC"). On June 23, 2021, Horton filed a civil rights complaint ("Complaint") under 42 U.S.C. § 1983 for events that occurred while Horton was incarcerated at the Ely State Prison ("ESP"). (ECF No. 1-1.)

The Complaint alleged the following: Horton had a stent implanted in his heart in February 2020 by a non-NDOC employed surgeon at a hospital in Ely. The surgeon

---

[1]      The parties have voluntarily consented to have this case referred to the undersigned to conduct all proceedings and entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 35.)

[2]      ECF No. 50 is the motion for summary judgment. ECF No. 52 consists of Horton's medical records filed under seal. ECF No. 56 consists of authenticating declarations filed in support of the exhibits to the motion for summary judgment.

[3]      ECF No. 67 is the response to the motion for summary judgment and ECF No. 66 consists of exhibits to the response.

1   instructed that for Horton's post-surgical care, he was to be placed on a low-sodium diet
2   and his heart, blood pressure, and breathing were to be monitored, sometimes daily. Dr.
3   Hanf was aware of the doctor's instructions but did not follow through with any of them.
4   (ECF No. 6 at 4-6, 14.)

5         Additionally, the Complaint alleged the following: when Horton was first transferred
6   to ESP, he had a telehealth appointment with Dr. Martin (who was at High Desert State
7   Prison ("HDSP")), and Dr. Martin told Horton that he was at the wrong prison: it was not
8   a medical facility and was at too high an elevation for a person with Horton's medical
9   conditions. Dr. Martin told Horton that he would put in for Horton to be transferred to the
10  Northern Nevada Correctional Center ("NNCC"), which is at a lower elevation, but that
11  didn't happen. Horton informed Dr. Hanf on several occasions that he "continuously"
12  experiences breathing complications and chest pain. Dr. Hanf responded that Horton's
13  breathing and respiratory issues could be because "Ely has an extremely high elevation."
14  Horton asked to be transferred to NNCC, but Dr. Hanf refused. Dr. Hanf knew that Horton
15  was on 22 medications and suffered from a myriad of serious medical conditions. (*Id.* at
16  4, 10-11.)

17        On January 18, 2022, the District Court screened the Complaint pursuant to 28
18  U.S.C. § 1915A. (ECF No. 5.) Horton was allowed to proceed on: (1) an Eighth
19  Amendment deliberate indifference to serious medical needs (failure to follow doctor's
20  orders) against Dr. Hanf; and (2) an Eighth Amendment deliberate indifference to serious
21  medical needs (failure to transfer to another facility) against Dr. Hanf. (*Id.* at 17-18.)

22        On August 23, 2023, Defendants filed their motion for summary judgment arguing:
23  (1) Dr. Hanf was not deliberately indifferent in treating Horton post-stent or that treatment,
24  or lack thereof, resulted in any harm; (2) Dr. Hanf was not deliberately indifferent toward
25  any need to transfer Horton to NNCC; and (3) Dr. Hanf is entitled to qualified immunity.
26  (ECF No. 50.)

27  ///

28  ///

2

**B.      Undisputed Facts re: Summary Judgment**

The following facts are undisputed: Horton was transferred to NNCC from HDSP on October 31, 2019. (ECF No. 50-2 at 2.) According to a case note dated October 31, 2019, in Horton's Offender Information Summary ("OIC"), Horton was approved for transfer from HDSP to NNCC for "RMF [Regional Medical Facility] admit." (ECF No. 50-3 at 8.) A case note dated November 4, 2019, states that Horton was "[r]eceived from HDSP for RMF however he was never admitted." (*Id.*) On November 6, 2019, a classification committee at NNCC determined Horton did "not need to remain at NNCC." (*Id.*) The note also reflects Horton was "[m]edical clear for transfer, prior approval for ESP." (*Id.*) Horton was transferred from NNCC to ESP on November 12, 2019. (ECF No. 50-2 at 2.) Horton was interviewed by medical and mental health staff upon his arrival at ESP, and no issues or concerns were noted. (ECF No. 50-3 at 8.)

On January 7, 2020, Dr. Hanf wrote orders and progress notes regarding a follow-up to Horton's recent EKG. (ECF No. 52-1 at 12; ECF No. 52-2 at 7 (sealed).) Dr. Hanf noted "EKG ischemic" changes, that a man down would be called, and that Horton would be referred to "Cardio (WBRH)." (*Id.*) On February 18, 2020, Horton underwent a cardiac catheterization procedure at William Bee Ririe Hospital ("WBRH") in Ely, Nevada. (ECF No. 2-3 at 12; ECF No. 52-4 at 22-33 (sealed).) Horton was discharged to ESP the same day, and discharge instructions prescribed a "low salt, low fat" diet and additional medication. (ECF No. 52-4 at 22 (sealed).)

Dr. Hanf saw Horton for a follow-up appointment on or about April 14, 2020. (ECF No. 52-2 at 6 (sealed).) During that appointment, Dr. Hanf evaluated Horton's medical condition for potential transfer to either the RMF or NNCC, as it was Horton's desire to be transferred out of ESP to NNCC. (*Id.*) After taking vitals and examining Horton, Dr. Hanf confirmed Horton's medical condition was stable. (*Id.*) Dr. Hanf also explained to Horton that his "current classification" was "appropriate." (*Id.*) Because Horton was medically stable, Dr. Hanf informed Horton that he was "not [an] RMF candidate," and, with regard to a general transfer to NNCC, that "medical cannot dictate specific facility." (*Id.*)

Dr. Hanf saw Horton again on February 2, 2021, for a 1-year follow-up from his stent surgery. (*Id.* at 3.) Horton "again [asked] re transfer to NNCC." (*Id.*) Dr. Hanf "reaffirmed" his opinion that Horton's condition was stable, that his medical classification was appropriate and did not require RMF placement, and that "medical does not dictate [a specific] institution." (*Id.*)

As part of the follow-up examination, Dr. Hanf ordered a referral to cardiology at WBRH for follow-up post stent. (ECF No. 52-4 at 16 (sealed).) Horton was seen at WBRH on March 9, 2021. (*Id.* at 2-7.) Both the attending physician and nurse at WBRH performed physical exams and noted that breathing was "not labored" and "breath sound within normal limits." (*Id.* at 5.) A chest x-ray, blood tests, and an EKG were performed, and proved normal. (*Id.* at 2-15.) Both the attending nurse and physician concluded that Horton's condition was "stable," and Horton was discharged to the ESP infirmary. (*Id.* at 4, 7.)

Medical records show that Horton received regular vital and blood pressure checks while at ESP. (ECF No. 52-6 (sealed).) Additionally, Dr. Hanf ordered an EKG on June 18, 2020, and Horton received several additional EKGs at ESP on June 21, 2020, July 12, 2020, March 10, 2021, and April 2, 2021. (ECF No. 52-7 (sealed).)

Horton was subjected to blood tests in the months following his hospitalization. (ECF No. 52-8 (sealed).) Blood tests, including lipid panels for triglyceride and cholesterol levels, were performed on the following dates while Horton was housed at ESP: Mar 6, 2020; April 24, 2020; May 1 and 8, 2020; October 24, 2020; February 27, 2021; and April 14, 2021. (*Id.*)

Horton's records also reflect that Horton refused medical treatment and/or vital checks on numerous occasions. (*See* ECF No. 52-5 (sealed).) For example, on March 14, 2020, vitals were taken, but Horton indicated to nursing staff that he was not taking his blood pressure medication. (ECF No. 52-3 at 19 (sealed).) On March 16, 2020, Dr. Hanf ordered nursing staff to "confirm/encourage compliance with all" vital checks and medication. (ECF No. 52-1 at 8 (sealed).) Additionally, at an appointment on April 14,

4

2020, Dr. Hanf noted that Horton was "combative toward staff." (ECF No. 52-3 at 20 (sealed).)

As to Horton's low sodium diet, on July 31, 2019, a memo was issued to all NDOC inmates announcing that new menus had been developed and would be served beginning August 3, 2019. (ECF No. 50-16 at 2.) The new menus were developed as a joint effort between NDOC, a dietician, and the state's Chief Medical Officer and several factors were considered, including the "[i]nterest and need to reduce the sodium content of the men's and women's main menus." (*Id.*) In an attached letter dated June 28, 2019, registered dietician and nutritionist Michele Cowee certified that the "new menus [were] designed to improve the dietary intake of the inmates" and that "[t]he sodium level has been cut in half." (*Id.* at 3.)

Additionally, the new menus were certified to meet the standards outlined in the "Dietary Guidelines for Americans 2015-2020" developed by the United States Department of Health and Human Services and the Department of Agriculture, and consistent with these guidelines, daily sodium intake on the main menu was reduced to no more than 2300 milligrams per day. (ECF No. 50-16; 50-17 at 16; 50-18.) As a result of the reduction of sodium in the diets, the low sodium medical diet was discontinued and removed from NDOC MD 124, effective September 2019. (ECF No. 50-19.) Despite the low sodium medical diet being discontinued, Dr. Naughton assigned Horton to the "Low Sodium 3000-4500mg" diet at NNCC on October 31, 2019. (ECF No. 52-9 at 2 (sealed).)

## II.    LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law applicable to the claim or claims determines which facts are material. *Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). Only disputes over facts that address the main legal question of the suit can preclude summary judgment, and factual disputes that are irrelevant are not

material. *Frlekin v. Apple, Inc.*, 979 F.3d 639, 644 (9th Cir. 2020). A dispute is "genuine" only where a reasonable jury could find for the nonmoving party. *Anderson*, 477 U.S. at 248.

The parties subject to a motion for summary judgment must: (1) cite facts from the record, including but not limited to depositions, documents, and declarations, and then (2) "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Documents submitted during summary judgment must be authenticated, and if only personal knowledge authenticates a document (i.e., even a review of the contents of the document would not prove that it is authentic), an affidavit attesting to its authenticity must be attached to the submitted document. *Las Vegas Sands, LLC v. Neheme*, 632 F.3d 526, 532-33 (9th Cir. 2011). Conclusory statements, speculative opinions, pleading allegations, or other assertions uncorroborated by facts are insufficient to establish the absence or presence of a genuine dispute. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019).

The moving party bears the initial burden of demonstrating an absence of a genuine dispute. *Soremekun*, 509 F.3d at 984. "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun*, 509 F.3d at 984. However, if the moving party does not bear the burden of proof at trial, the moving party may meet their initial burden by demonstrating either: (1) there is an absence of evidence to support an essential element of the nonmoving party's claim or claims; or (2) submitting admissible evidence that establishes the record forecloses the possibility of a reasonable jury finding in favor of the nonmoving party. *See Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 593-94 (9th Cir. 2018); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The court views all evidence and any inferences arising therefrom in the light most favorable to the nonmoving party. *Colwell v.*

*Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014). If the moving party does not meet its burden for summary judgment, the nonmoving party is not required to provide evidentiary materials to oppose the motion, and the court will deny summary judgment. *Celotex*, 477 U.S. at 322-23.

Where the moving party has met its burden, however, the burden shifts to the nonmoving party to establish that a genuine issue of material fact actually exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, (1986). The nonmoving must "go beyond the pleadings" to meet this burden. *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021) (internal quotation omitted). In other words, the nonmoving party may not simply rely upon the allegations or denials of its pleadings; rather, they must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. *See* Fed.R.Civ.P. 56(c); *Matsushita,* 475 U.S. at 586 n. 11. This burden is "not a light one," and requires the nonmoving party to "show more than the mere existence of a scintilla of evidence." *Id.* (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)). The non-moving party "must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Pac. Gulf Shipping Co.*, 992 F.3d at 898 (quoting *Oracle Corp. Sec. Litig.*, 627 F.3d at 387). Mere assertions and "metaphysical doubt as to the material facts" will not defeat a properly supported and meritorious summary judgment motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

When a *pro se* litigant opposes summary judgment, his or her contentions in motions and pleadings may be considered as evidence to meet the non-party's burden to the extent: (1) contents of the document are based on personal knowledge, (2) they set forth facts that would be admissible into evidence, and (3) the litigant attested under penalty of perjury that they were true and correct. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

///

Upon the parties meeting their respective burdens for summary judgment, the court determines whether reasonable minds could differ when interpreting the record; the court does not weigh the evidence or determine its truth. *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015). The court may consider evidence in the record not cited by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3). Nevertheless, the court will view the cited records before it and will not mine the record for triable issues of fact. *Oracle Corp. Sec. Litig.*, 627 F.3d at 386 (if a nonmoving party does not make nor provide support for a possible objection, the court will likewise not consider it).

III.   **DISCUSSION**

A.   **Eighth Amendment – Deliberate Indifference to Serious Medical Needs**

The Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency" by prohibiting the imposition of cruel and unusual punishment by state actors. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (internal quotation omitted). The Amendment's proscription against the "unnecessary and wanton infliction of pain" encompasses deliberate indifference by state officials to the medical needs of prisoners. *Id.* at 104 (internal quotation omitted). It is thus well established that "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Id.* at 105.

Courts in Ninth Circuit employ a two-part test when analyzing deliberate indifference claims. The plaintiff must satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (internal quotation omitted). First, the objective component examines whether the plaintiff has a "serious medical need," such that the state's failure to provide treatment could result in further injury or cause unnecessary and wanton infliction of pain. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Serious medical needs include those "that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's

8

daily activities; or the existence of chronic and substantial pain." *Colwell*, 763 F.3d at 1066 (internal quotation omitted).

Second, the subjective element considers the defendant's state of mind, the extent of care provided, and whether the plaintiff was harmed. "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan,* 296 F.3d 732, 744 (9th Cir. 2002) (internal quotation omitted). However, a prison official may only be held liable if they "knows of and disregards an excessive risk to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1050, 1057 (9th Cir. 2004). The defendant prison official must therefore have actual knowledge from which they can infer that a substantial risk of harm exists, and also make that inference. *Colwell*, 763 F.3d at 1066. An accidental or inadvertent failure to provide adequate care is not enough to impose liability. *Estelle*, 429 U.S. at 105–06. Rather, the standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other. . ." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Accordingly, the defendants' conduct must consist of "more than ordinary lack of due care." *Id.* at 835 (internal quotation omitted).

### 1.   Analysis

Starting with the objective element, the parties agree that Horton's heart condition, breathing and respiratory issues constitute "serious medical needs." However, Defendants argue summary judgment should be granted because Horton cannot establish the second, subjective element of his claims. Specifically, Defendants argue they were not deliberately indifferent to Horton's conditions. Under the subjective element, there must be some evidence to create an issue of fact as to whether the prison official being sued knew of, and deliberately disregarded the risk to Horton's safety. *Farmer*, 511 U.S. at 837. "Mere negligence is not sufficient to establish liability." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). Moreover, this requires Horton to "demonstrate that the defendants' actions were both an actual and proximate cause of [his] injuries." *Lemire v. California*, 726 F.3d 1062, 1074 (9th Cir. 2013) (citing *Conn v. City of Reno*, 591 F.3d

1081, 1098- 1101 (9th Cir. 2010), *vacated by City of Reno, Nev. v. Conn*, 563 U.S. 915 (2011), *reinstated in relevant part* 658 F.3d 897 (9th Cir. 2011).

Here, as detailed above, Dr. Hanf submitted authenticated and undisputed evidence which affirmatively shows Horton received adequate care while incarcerated related to his heart condition, breathing, and respiratory issues. (*See* ECF Nos. 52-1, 52-2, 52-3, 52-4, 52-5, 52-6, 52-7, 52-8, 52-9 (sealed).) Evidence shows that Horton received continuous monitoring for his medical conditions—(*See* ECF Nos. 52-6, 52-7, 52-8 (sealed))—despite his own refusal to accept the medical care on numerous occasions. (*See* ECF No. 52-5 (sealed).) Additionally, Horton does not dispute that low sodium diets were discontinued by NDOC and replaced by a mainline diet with lower sodium content than the discontinued low sodium diet. (ECF Nos. 50-16, 50-17, 50-18.) Further, Dr. Hanf provided evidence that as a medical provider, he did not have a say about placement at a particular facility. (*See* ECF No. 52-2 at 3, 6.)

Accordingly, Dr. Hanf has met his initial burden on summary judgment by showing the absence of a genuine issue of material fact as to the deliberate indifference claims related to low sodium diet, vital monitoring, and transfer. *See Celotex Corp.*, 477 U.S. at 325. The burden now shifts to Horton to produce evidence that demonstrates an issue of fact exists as to whether Defendants were deliberately indifferent to his medical needs. *Nissan*, 210 F.3d at 1102.

Aside from his own assertions, Horton provides no further evidence or support that a denial or delay in treatment caused him <u>any</u> damage. He has not come forward with evidence to show Dr. Hanf knew of an excessive risk to his health and disregarded that risk. To the contrary, the evidence before the Court shows Horton's concerns about his heart, breathing, and respiratory issues were affirmatively treated and there is no evidence showing that he suffered any damage because of not being housed at his preferred facility. Therefore, Horton has failed to meet his burden on summary judgment to establish that prison officials were deliberately indifferent to his medical needs, as he failed to come forward with any evidence to create an issue of fact as to whether

1   Defendants deliberately denied, delayed, or intentionally interfered with treatment related

2   to his pelvic girdle. *See Hallett*, 296 F.3d at 744.

3          Moreover, to the extent that Horton's assertions in this case are based upon his

4   disagreement with Dr. Hanf's choice of treatment, this does not amount to deliberate

5   indifference. *See Toguchi*, 391 F.3d at 1058. In cases where the inmate and prison staff

6   simply disagree about the course of treatment, only where it is medically unacceptable

7   can the plaintiff prevail. *Id.* Horton has failed to show that Dr. Hanf's "chosen course of

8   treatment was medically unacceptable under the circumstances." *Id.* Accordingly, Horton

9   fails to meet his burden to show an issue of fact that Dr. Hanf was deliberately indifferent

10  to his needs because Horton has only shown that he disagrees between alternative

11  courses of treatment, such as being placed at a certain facility.

12         Accordingly, Dr. Hanf's motion for summary judgment is granted in its entirety.[4]

13  **IV.   CONCLUSION**

14         The Court notes that the parties made several arguments and cited to several

15  cases not discussed above. The Court has reviewed these arguments and cases and

16  determines that they do not warrant discussion as they do not affect the outcome of the

17  issues before the Court.

18         For the reasons stated above, **IT IS ORDERED** that Dr. Hanf's motion for summary

19  judgment, (ECF No. 50), is **GRANTED.**

20         **IT IS FURTHER ORDERED** that the Clerk of the Court **CLOSE** this case and

21  **ENTER JUDGMENT** accordingly.

22  **DATED**: December 27, 2023.

23

24                                                 _____

25                                                 **UNITED STATES MAGISTRATE JUDGE**

26  _____
    [4]      Where the Court determines a plaintiff's allegations fail to show a statutory or
27  constitutional violation, "there is no necessity for further inquiries concerning qualified
    immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Here, Horton is unable to establish
    a violation of his rights under the United States Constitution. Accordingly, there is no need
28  for the Court to address Dr. Hanf's arguments regarding qualified immunity.